In the Matter of the Application for the Disbarment of Peter George HEDLUND, an Attorney at Law of the State of Minnesota.

No. 49578.

Supreme Court of Minnesota.

May 16, 1980.

**64**

Michael J. Hoover, Adm. Director on Professional Conduct, and Richard C. Baker, Staff Atty., Lawyers Professional Responsibility Board, St. Paul, for appellant.

Thomson & Nordby and Jack S. Nordby, St. Paul, for respondent.

PER CURIAM.

Peter George Hedlund was a duly licensed lawyer in the State of Minnesota. He was convicted of the felonious crimes of presenting false claims to a public body, Minn.Stat. §§ 609.465 and 609.05, and diversion of corporate property from a corporation, Minn.Stat. §§ 300.60 and 609.05. On October 13, 1976, Hedlund was suspended from the practice of law pending appeal of his conviction. His conviction was affirmed by this court. *State v. Strimling*, 265 N.W.2d 423 (Minn.1978). This petition was filed and the matter referred to a referee for hearing. The referee recommended disbarment. We order disbarment.

The facts relating to Hedlund's conviction on two felony counts are detailed in *State v. Strimling* and will not be restated except as pertinent to our present disposition.

At the hearing before the referee, six character witnesses testified on Hedlund's behalf. Each witness had known Hedlund personally and professionally for an average period of 20 years. In their testimony, the witnesses described Hedlund as "perfectly honest", "above board", "extremely fair", and a "very competent, hardworking, trustworthy lawyer" despite the River Villa episode which is the basis for his convictions. The witnesses also testified that Hedlund did more than the average amount of civil pro bono work, always "plugging himself into the work" even though no fee could be obtained. Finally, the witnesses testified as to the harmful effects which the felony convictions and disbarment procedures were having on Hedlund's family. Mrs. Hedlund, who suffers from arthritis severe enough to make her semi-crippled, has experienced deterioration in her mental and physical condition since this episode began. The Hedlunds' daughter has relinquished all of her activities to stay home to help the family through this troubled time.

In his testimony, Hedlund reviewed his legal career. He began as a law clerk for the Minnesota Supreme Court, then undertook a suburban practice which emphasized municipal work. Later, he joined with a group of young lawyers to do litigation and appellate work. After 20 years, he sold out his interest in the courtroom practice because of his health and started some business ventures. He became a corporate lawyer, working to finance the construction of mobile home parks and the first steel and cement—not wooden—nursing homes in the Twin City area. Because of the felony con-

victions which arose from his involvement in the River Villa project, however, Hedlund lost everything he had. At present, Hedlund has debts of over $500,000.

Hedlund has looked for employment but has not found any. His wife is unable to do any work for their support. Hedlund believes that he could get corporate legal work if he did not have the stigma of disbarment, even though he has felony convictions, because of the affirmative action programs some companies have for felons. Hedlund believes that he could qualify for this type of program because he has never had a complaint about his legal work and has not previously appeared before the ethics board.

Hedlund was fined $7,500 and has served 9 months of his concurrent 2½- and 3-year prison terms in Stillwater Prison. He is now on parole. Hedlund still believes that he had nothing to do with the fraud at River Villa, although he does admit that he has been convicted of a crime. His position is summarized best in part of his testimony:

Q Well, you said you admitted that you were convicted of a felon?

A Yes, sir.

Q Do you admit that you engaged in the facts and the facts that underlie that conviction?

A Well, the head of the parole board asked me the same question—Mr. Green. And I answered it this way and I'll answer it to you. I have been convicted by a jury. I recognize the legal system, and I recognize its obligations and its rights.

To ask me to say was the jury wrong, I think violates the very fundamental things I believe in in terms of the system. Do you want me to say the jury was wrong? I'll answer it. I think Mr. Green was right when asking me the question. He said, "you are here because you've been convicted of a crime." I said, "that's absolutely true. I had my day in court. I took an appeal to the Supreme Court. The Supreme Court sustained it, and I don't think it's my position to say that the jury was right or wrong." Do you want my opinion? The jury was wrong. That's why I fought it. If I thought I was guilty, I would have pled guilty. Like the judge said, that isn't what we're here for.

Q What excuse do you have for having done those things?

A I say if the jury found me guilty of them, then I'm guilty of them. That doesn't mean that within my own heart I did anything wrong. Now what you want me to say is that I was guilty. If I was guilty, I would have pled guilty to it. I had my day in court. The jury found me guilty. Remember, Kritzman and Hartkopf testified that I committed these acts.

These were convicted felons. They were given the opportunity to stay out of the penitentiary if they would testify against George Hedlund. I guess I don't blame them for doing it, but that's life. The jury found me guilty, and I admit that I was found guilty.

The Lawyers Professional Responsibility Board contends that Hedlund's failure to repent for his actions is an aggravating circumstance which mandates his disbarment. Hedlund contends that repentance is not a determinative factor in disbarment cases and that there are mitigating circumstances in this case which make disbarment an inappropriate discipline.

█ 1. The board suggests that we consider Hedlund's failure to repent as evidence in support of its request for disbarment. We decline to do so under the facts of this case. We adopt the position of the Massachusetts Supreme Court in considering the application of Alger Hiss for reinstatement. The court there said:

The continued assertion of innocence in the face of prior conviction does not, as might be argued, constitute *conclusive* proof of lack of the necessary moral character to merit reinstatement. Though we deem prior judgments dispositive of all

factual issues and deny attorneys subject to disciplinary proceedings the right to relitigate issues of guilt, we recognize that a convicted person may on sincere reasoning believe himself to be innocent. We also take cognizance of Hiss's argument that miscarriages of justice are possible. Basically, his underlying theory is that innocent men conceivably could be convicted, that a contrary view would place a mantle of absolute and inviolate perfection on our system of justice, and that this is an attribute that cannot be claimed for any human institution or activity. We do not believe we can say with certainty in this case, or perhaps any case, what is the true state of mind of the petitioner. Thus, we cannot say that every person, who under oath, protests his innocence after conviction and refuses to repent is committing perjury.

Simple fairness and fundamental justice demand that the person who believes he is innocent though convicted should not be required to confess guilt to a criminal *act* he honestly believes he did not commit. For him, a rule requiring admission of guilt and repentance creates a cruel quandary: he may stand mute and lose his opportunity; or he may cast aside his hard-retained scruples and, paradoxically, commit what he regards as perjury to prove his worthiness to practice law. Men who are honest would prefer to relinquish the opportunity conditioned by this rule: "Circumstances may be made to bring innocence under the penalties of the law. If so brought, escape by confession of guilt * * * may be rejected,—preferring to be the victim of the law rather than its acknowledged transgressor—preferring death even to such certain infamy." *Burdick v. United States*, 236 U.S. 79, 90–91, 35 S.Ct. 267, 269, 59 L.Ed. 476 (1915). Honest men would suffer permanent disbarment under such a rule. Others, less sure of their moral positions, would be tempted to commit perjury by admitting to a nonexistent offense (or to an offense they believe is nonexistent) to secure reinstatement. So regarded, this rule, intended to maintain

the integrity of the bar, would encourage corruption in these latter petitioners for reinstatement and, again paradoxically, might permit reinstatement of those least fit to serve. We do not consider in this context the person who admits committing the alleged criminal act but honestly believes it is not unlawful. [Footnotes omitted.]

*In re Hiss*, 368 Mass. 447, 457, 333 N.E.2d 429, 436 (1975). Thus, while the failure to repent may be an aggravating circumstance in some cases, we do not consider it so here since Hedlund merely maintains that he did not commit the acts for which he was convicted.

■ 2. This is not to say that we accept Hedlund's version of the facts underlying his convictions. Under Rule 19(a), Rules on Lawyers Responsibility, a lawyer's criminal conviction is conclusive evidence that he committed the conduct for which he was convicted. Hedlund states his acceptance of this rule but invites this court to review the convictions for the purpose of evaluating his claims that there were mitigating circumstances surrounding his conviction. Insofar as this is an attempt to have us relitigate the facts of the criminal convictions, we reaffirm our refusal to do so. As we stated in *Matter of Scallen*, 269 N.W.2d 834, 840 (Minn.1978):

[Scallen contends] the facts necessarily found by the Canadian jury in support of its guilty verdict are not entitled to full weight in a disciplinary proceeding in this country. We are unable to accept Scallen's position because we find that it amounts to little more than an attractively packaged invitation to relitigate the facts underlying his conviction. This practice we decline to adopt.

However, we will look at the circumstances surrounding the criminal act to see whether some discipline less than disbarment would be appropriate.

■ 3. With these preliminary matters placed in proper perspective, we are able to consider Hedlund's claim of mitigating circumstances in this case. We recognize that we have considered mitigating circumstanc-

es when the underlying conviction arises from business activities of a lawyer and not from activities directly related to the practice of law. *Matter of Scallen,* 269 N.W.2d 834 (Minn.1978). We also recognize that felony convictions do not result in automatic disbarment. *In re Scholle,* 274 N.W.2d 112 (Minn.1978). In this case Hedlund points to the mitigating circumstances of his long, distinguished, and unblemished career as a lawyer. He points to his public service and the laudable amount of pro bono work he has performed. He also points to his financial difficulties and the stress his difficulties have placed on his family. Finally, Hedlund claims that he should not be made to bear full responsibility for the rebate scheme because he was not involved in the day-to-day activities of the nursing home.

While these circumstances may be sufficient to mitigate an order of disbarment in a given case, each case must be decided on its own facts. We are not bound to order disbarment based upon the presence or absence of a particular fact or facts in the record. Rather, we are bound to examine the circumstances of each case thoroughly in order to reach a decision which protects the public and the administration of justice from lawyers who have demonstrated by their conduct that they are unable or are likely to be unable to properly discharge their professional duties. *In re Application for Discipline of Rerat,* 232 Minn. 1, 44 N.W.2d 273 (1950). Rule 1.1, *Standards for Lawyer Discipline and Disability Proceedings* (American Bar Association Approved Draft, February 1979).

In this case, the weight of danger in Hedlund's activities outweighs the weight of the mitigating circumstances. The facts disclose that Hedlund personally profited from the illegal rebate scheme; that he presented false claims to a public body; that his conduct was not a single offense but was spread out over a period of time; and that he had counseled his coconspirators to "stick together" on the rebate scheme and to lie about the use of rebated cash. Hedlund's claim that he should not be held fully responsible for the rebate scheme because he was not involved in the day-to-day operation of the nursing home is not credible. He had sufficient experience to realize that illegal activities were taking place at River Villa because he had previously invested in several nursing homes, he had served on the Minnesota Board of Health, and he was experienced in evaluating nursing home accounting and reporting procedures.

Evaluating the record in this case in light of our duty to protect the public and the administration of justice, we accept the recommendation of the referee that Hedlund be disbarred at this time. The fact that this decision has regrettable effects upon Hedlund's family and financial situation cannot be allowed to prevent disbarment when Hedlund's continued practice at this time would present a danger to the public and the administration of justice.

Peter George Hedlund is ordered disbarred and his name shall be removed from the list of licensed lawyers within the State of Minnesota.