In re Petition for DISCIPLINARY AC-TION AGAINST Sergio Roberto AN-DRADE, a Minnesota Attorney, Registration No. 261750.

No. A06–426.

Supreme Court of Minnesota.

July 19, 2007.

Rehearing Denied Aug. 23, 2007.

Martin A. Cole, Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for petitioner.

Paul C. Peterson, William L. Davidson, Lind, Jensen, Sullivan & Peterson, PA, Minneapolis, MN, for respondent Sergio Roberto Andrade.

## OPINION

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against Sergio Roberto Andrade after Andrade was convicted of attempted theft by swindle of more than $2,500. We referred the matter to a referee for findings of fact, conclusions of law, and recommendation for discipline. Although both Andrade and the Director disagree with the referee's recommended discipline, neither Andrade nor the Director contest the referee's findings of fact

or conclusions of law. Based on those findings of fact and conclusions of law, and on the facts of the matter as found by the district court in Andrade's criminal trial,[1] we conclude that disbarment of Andrade is necessary to protect the integrity of the judicial system and to protect the public.

Andrade's conviction of attempted theft by swindle stems from his representation of client M, whom Andrade had represented since 1995 or 1996 in some 30 different matters. In 2004, narcotics officers from the Minneapolis Police Department executed a search warrant on M's home, where they found cocaine and marked bills used in an earlier controlled drug buy from M. Andrade eventually negotiated an agreement between M and the Minneapolis police under which M would not be prosecuted in exchange for M's assistance in making controlled drug buys from two drug dealers. At the time, M owed Andrade at least $5,500 in legal fees.

It is undisputed that over the years M had urged Andrade to bribe a judge or the police to eliminate M's various legal problems and that Andrade had, at least to the point in time when cocaine was found in M's home, refused. But shortly after making the first of the two required controlled drug buys, M told officers that Andrade had asked for $50,000 to bribe an unnamed high-ranking police official to dismiss the pending drug charges. In a series of meetings, recorded by law enforcement with M's cooperation, Andrade alternately told M that he had personally paid $25,000 to the official and needed to pay the $25,000 balance, and that he had paid another $15,000 to the "person who is in charge of all the police of the Drug Task Force," leaving an additional $10,000 to be paid. Andrade further told M that

this was not the first time he had asked this person for a favor. At the last meeting between M and Andrade, M gave Andrade $5,000 in cash, provided by law enforcement, as partial payment of the would-be bribe. Andrade was arrested after leaving the meeting with M, and the cash was recovered. There is no evidence that Andrade actually offered or paid any bribe on M's behalf. Andrade contends in these proceedings that his statements to M were a means of obtaining payment of M's past-due legal bills but, as the district court observed in the criminal proceedings, the amount of money Andrade sought from M was far more than what M owed Andrade.

On December 12, 2005, the district court found Andrade guilty of attempted theft by swindle of over $2,500, in violation of Minn.Stat. § 609.52, subds. 2(4) and 3(2) (2006). On February 14, 2006, the Director filed a petition for disciplinary action and later filed a petition requesting that we temporarily suspend Andrade pending this court's final determination of discipline. We denied the petition for temporary suspension but required Andrade to be supervised by another attorney pending final resolution of these proceedings.

We referred the case to a referee for findings of fact and conclusions of law, as provided for in Rule 14, Rules on Lawyers Professional Responsibility (RLPR). The referee conducted an evidentiary hearing at which Andrade testified and called character witnesses on his behalf. At the hearing, Andrade did not dispute the factual findings supporting his felony conviction and agreed that some public discipline was appropriate. Andrade further testi-

---

**1.** Under Rule 19(a), Rules on Lawyers Professional Responsibility (RLPR), a criminal conviction is conclusive evidence that the lawyer committed the misconduct for which he was convicted.

fied that when M suggested that Andrade bribe a judge or a police officer, Andrade took that as "an opportunity to get paid." After the evidentiary hearing, the referee concluded that Andrade's conduct violated Minn. R. Prof. Conduct 1.7(a)(2)[2] and 8.4(b), (c), (d), and (e).[3] Although the presumptive punishment for a felony conviction is disbarment, the referee recommended indefinite suspension with leave to petition for reinstatement after two years.

■ We give significant weight to the referee's recommendations for discipline. *In re Oberhauser*, 679 N.W.2d 153, 159 (Minn.2004). But Andrade has been convicted of a felony, and the presumptive discipline for a felony conviction is disbarment, particularly where the criminal conduct occurs (as in this case) within the practice of law. *See In re Perez*, 688 N.W.2d 562, 567–69 (Minn.2004). We have ordered a lesser sanction than the presumptive discipline of disbarment where there exist substantial mitigating circumstances. *See, e.g., In re Olkon*, 324 N.W.2d 192, 196 (Minn.1982). In this case, the referee found as mitigating factors Andrade's lack of prior disciplinary history, his substantial community service and pro bono work in the Hispanic community, his reputation with the judiciary and the practicing bar, his cooperation with the Director's investigation, and the fact that the violations involved only one person. The referee found as aggravating factors that Andrade's violations took place within the practice of law and that Andrade initially denied the allegations against him even in the face of recordings of his conduct.

We agree with Andrade that, in the proper case, mitigating factors can warrant a sanction less than disbarment for a felony conviction. For example, in *Olkon* we cited such mitigating factors as a long history of pro bono work and the attorney's competence and integrity as justification for not disbarring an attorney convicted of attempted theft by swindle involving insurance fraud. *Id.* at 196. In *In re Daffer*, 344 N.W.2d 382, 385 (Minn.1984), we similarly declined to disbar an attorney convicted of mail fraud, citing the referee's findings regarding the attorney's remorse, full and prompt restitution, good character, cooperation, and the fact that all of the acts constituting the fraud occurred within a very brief time and arose from a single transaction.

---

2. Rule 1.7(a)(2) bars a lawyer from representing a client if "there is a significant risk that the representation * * * will be materially limited * * * by a personal interest of the lawyer." Although the referee found a violation of Rule 1.7(a)(2), that rule was added effective October 1, 2005, after the conduct at issue occurred. Prior to October 1, 2005, Minn. R. Prof. Conduct 1.7(b) prohibited representation in the same circumstances, although using slightly different language: "A lawyer shall not represent a client if the representation of that client may be materially limited * * * by the lawyer's own interests * * *." Minn. R. Prof. Conduct 1.7(b), 14 Minnesota Statutes 1391 (2004) (amended Oct. 1, 2005). Because the substance of the old and new rules is the same, the erroneous citation to the new rule has no effect on the issues or analysis in this case.

3. Rule 8.4(b) makes it professional misconduct for a lawyer to "commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer." Rule 8.4(c) makes it professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Rule 8.4(d) makes it professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." Rule 8.4(e) makes it professional misconduct for a lawyer to "state or imply an ability to influence improperly a government agency or official." Rule 8.4 was also amended effective October 1, 2005. The changes in the relevant provisions of Rule 8.4 have no substantive effect on the issues or analysis in this case. Therefore, for simplicity, we cite only the current versions of the applicable rules.

The primary purpose of disciplinary action is "to guard the administration of justice and to protect the courts, the legal profession, and the public." *In re Hanson,* 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960). Accordingly, we consider whether, in light of the mitigating factors found by the referee, a sanction less than disbarment would adequately serve those interests in this case. *Daffer,* 344 N.W.2d at 385. We conclude it would not.

First, the person Andrade attempted to swindle was his own client. Moreover, Andrade attempted to swindle a long-time client, someone he had represented for many years in some 30 different matters. As we observed in *In re Benson,* a case in which we also disbarred the attorney, if an attorney would misappropriate funds from a long-time client and friend, "[t]he general public, with no such relationship, would hardly be protected from similar misconduct." 431 N.W.2d 120, 124 (Minn.1988).

Second, although we allowed Andrade to practice under supervision for the brief time this matter has been pending, and although Andrade urges us to impose suspension and supervised probation as an alternative to disbarment, the nature of the supervised probation we impose as a disciplinary sanction is unlikely to detect this type of misconduct. We typically order the appointment of a supervisor to monitor the practice of an attorney who has neglected client matters in the past as a means of ensuring that the attorney meets court-imposed deadlines, returns phone calls and correspondence promptly, and otherwise completes client matters on a timely basis. *See, e.g., In re Berndt,* 719 N.W.2d 642, 643 (Minn.2006) (outlining conditions of supervision). Andrade makes no argument that supervised probation would have prevented him from committing this crime or that supervised probation would have detected it afterwards. As a result, supervised probation is unlikely to deter similar misconduct in the future.

Finally, Andrade has violated Minn. R. Prof. Conduct 8.4(e). We have rarely been faced with the task of disciplining attorneys charged with implying the ability to improperly influence a government agency or official, but when we have, we have disbarred the attorney. *See, e.g., In re Gillard,* 271 N.W.2d 785, 805 (Minn.1978). We have done so because such misconduct calls into question the very integrity of the judicial system, a system the attorney has sworn to uphold. And in this case, Andrade's actions effectively reinforced his client's cynical view of the legal system as corrupt and subject to influence. The harm of such conduct to the public and to the judicial system outweighs the mitigating circumstances found by the referee.

Andrade urges us to impose upon him only a short suspension followed by supervised probation, comparing his case to that of *Olkon.* Olkon unwittingly represented two undercover police officers posing as automobile accident victims, and negotiated an insurance settlement on behalf of one of them knowing that the client's claimed injuries were faked. *Olkon,* 324 N.W.2d at 193–95. While Olkon was also convicted of attempted theft by swindle, we declined to impose automatic disbarment and instead suspended Olkon and barred him from practicing personal injury law. *Id.* at 196.

Olkon's situation differs from Andrade's in several ways. First, the entity Olkon was convicted of attempting to swindle was an insurance company that was cooperating with the police investigation of insurance fraud. *Id.* at 194. In contrast, Andrade took advantage of M's particular legal vulnerabilities and M's long-standing suspicion of the American judicial system

to pressure M to participate in the bribery scheme. Among the matters in which Andrade was representing M was an effort to obtain legal residency status for M's wife, with M as her sponsor. Andrade was already attempting to get M's earlier drug and domestic assault convictions expunged; further criminal charges would spell the end of M's hopes of sponsoring his wife and presumably culminate in her deportation. Andrade does not now dispute that he told M that unless M gave him $50,000 the police would bring new drug charges as a result of the drugs discovered in the search of M's home.

Second, the attempted swindle of which Olkon was convicted was not Olkon's idea. Rather, undercover officers were referred to Olkon by the business manager of a doctor being investigated for insurance fraud. *Id.* While it is clear that Olkon was aware of the doctor's questionable diagnoses and expressed doubts about the officers' injuries, the suggestion to file an insurance claim was not Olkon's. *See id.* In contrast, in this case, while M had suggested bribing the police or a judge in the past, it was Andrade who concocted the $50,000 bribery scheme.

Third, by barring Olkon from practicing personal injury law, we were able to effectively eliminate Olkon's contact with those he was charged with attempting to swindle, namely, insurance companies. In contrast, Andrade urges us not to disbar him so that he can continue to represent private clients in criminal defense matters and, in particular, the Hispanic community. But it was a private client from the Hispanic community in a criminal defense matter that Andrade was convicted of attempting to swindle. We placed Olkon on supervised probation following his suspension, which was likely to detect and deter the type of insurance fraud in which Olkon engaged. In contrast, as we noted above,

supervised probation is unlikely to reveal the type of misconduct for which Andrade has been convicted, and thus is of little deterrent effect. Nor can we conceive of any conditions we could place on Andrade's continued practice that would be likely to reveal further misconduct of this type. As a result, Andrade's alternative discipline fails to adequately protect the public or the judicial system in the same way our discipline in *Olkon* did.

For these reasons, Andrade is hereby disbarred, effective 14 days from the date of filing of this opinion. Andrade shall comply with Rule 26, RLPR (requiring notice of disbarment to clients, opposing counsel, and tribunals, and requiring delivery of client papers and property).

Disbarred.

GILDEA, J., took no part in the consideration or decision of this case.

PAGE, Justice (dissenting).

I respectfully dissent, for two reasons. First, I find the court's penalty of disbarment disproportionately harsh when compared with the discipline imposed for comparable offenses in the past. Second, I conclude that the lesser penalty of suspension followed by supervised probation would satisfy the purposes of attorney discipline proceedings, as we have articulated them.

The court begins with the premise that the presumptive discipline to be imposed, based on Andrade's felony conviction, is disbarment, and that lesser discipline is to be imposed only when there exist "substantial mitigating circumstances." It is true that we have made such blanket statements in the past. *See, e.g., In re Pugh,* 710 N.W.2d 285, 288 (Minn.2006) (quoting *In re Anderley,* 481 N.W.2d 366, 369 (Minn.1992)).

But our jurisprudence has been less rigid. In any number of cases over the past half century, we have imposed discipline short of disbarment for felony convictions, often without any mention whatsoever of mitigating circumstances. We have done so both by accepting the parties' stipulation to such discipline, and over the objections of the Director. *See, e.g., In re Lahlum,* 719 N.W.2d 707 (Minn.2006) (imposing by order after stipulation an indefinite suspension for a minimum of 18 months for felony theft with no mention of mitigating circumstances); *In re Post,* 686 N.W.2d 529 (Minn.2004) (imposing by order after stipulation a six-month stayed suspension and five years' unsupervised probation for felony DWI with no mention of mitigating circumstances); *In re Barta,* 461 N.W.2d 382 (Minn.1990) (rejecting Director's request for disbarment and suspending attorney convicted of tax fraud and evasion, citing as mitigating factors only the attorney's lack of both client complaints and prior disciplinary actions, three terms as county attorney, and some pro bono service in the form of fee waivers for poorer clients); *In re Serstock,* 432 N.W.2d 179 (Minn.1988) (suspending attorney indefinitely but for no less than two years for dismissing traffic tickets while a deputy city attorney for friends who had loaned him money and given him other favors and for failing to file income tax returns); *In re Kimmel,* 322 N.W.2d 224 (Minn.1982) (rejecting Director's request for disbarment and suspending attorney convicted of felony criminal sexual conduct); *In re Scholle,* 274 N.W.2d 112 (Minn.1978) (imposing by order after stipulation, along with other conditions, a two-year suspension following attorney's conviction of conspiracy to import and distribute cocaine with no mention of mitigating circumstances); *In re Scallen,* 269 N.W.2d 834 (Minn.1978) (rejecting referee's recommendation of disbarment and imposing an indefinite suspension of no less than five years on an attorney convicted of securities fraud and felony theft of $3 million); *In re Swagler,* 239 Minn. 566, 58 N.W.2d 272 (1953) (suspending for six months an attorney convicted of criminal negligence in which a person died).[1] To highlight just one example, in *In re Singer,* 630 N.W.2d 404 (Minn.2001), we accepted without comment the stipulation of the Director and the lawyer to a suspension for a minimum of three years, despite the fact that the lawyer had been convicted in state court of felony theft for misappropriating funds from his attorney trust account.

Our rationale, when we have offered one, for not disbarring the convicted attorney has varied. For example, in *Barta,* faced with not only a felony conviction but six years of trust account violations and misappropriation of client funds in two matters, we managed to find mitigation in the facts that respondent had not previously been disciplined, that respondent had served three terms as county attorney, that respondent had "from time to time" waived fees for clients, and that an investigation turned up no additional client complaints. 461 N.W.2d at 385. In *Swagler,* we noted that the respondent's record "was practically unblemished" before his conviction, and we predicted "it is very doubtful that any occasion for disciplinary action of this lawyer will arise in the future." 239 Minn. at 567, 58 N.W.2d at 272.

---

**1.** Serstock was indicted by a grand jury on three counts of misconduct in office, but the indictment was dismissed on grounds that the facts alleged in the indictment did not constitute an offense and that the language of the indictment was not sufficiently specific. *State v. Serstock,* 402 N.W.2d 514, 515 (Minn.1987). We affirmed the dismissal of the indictment, noting that "the Lawyers Professional Responsibility Board is free to determine whether respondent's alleged activities may warrant any disciplinary action." *Id.* at 520 n. 6.

In *Serstock*, the case of the city attorney who "fixed" a myriad of traffic tickets for friends and creditors, our rationale for suspension appears to be only that the attorney's misconduct "harmed no one person individually," even as we acknowledged that the harm "was to the public and the legal system as a whole." 432 N.W.2d at 185. In *Scallen*, our rationale for not disbarring an attorney convicted of securities fraud and felony theft appears to have been related to "the caliber and standing in the legal community of the witnesses who came forth to testify" on Scallen's behalf. 269 N.W.2d at 841.

Andrade's circumstances are not qualitatively different. For example, there is no dispute that, like Barta, Andrade has served a segment of the population generally underrepresented in legal matters and has performed significant amounts of pro bono legal work. Nor is there any dispute that, like Swagler, Andrade has not previously been disciplined, and that his present difficulties are an aberration in an otherwise exemplary life and career. Andrade has acknowledged his guilt and has cooperated in these proceedings. As in *Scallen*, the witnesses on Andrade's behalf—including two sitting judges in Ramsey County—were both unanimous in their support for him and above question in their qualifications. Further, while Andrade's misconduct, like the misconduct in *Serstock*, did harm "to the public and the legal system as a whole," the misconduct "harmed no one person individually."

And so my analysis of the case starts not from the presumption of disbarment, but with an analysis of what sanction best serves the purposes of attorney discipline, as we have expressed them. As the court states, the primary purpose of disciplinary action is "to guard the administration of justice and to protect the courts, the legal profession, and the public." *In re Hanson*, 258 Minn. 231, 233, 103 N.W.2d 863, 864 (1960). I conclude that suspension for a significant period of time, followed by supervised probation, would serve those purposes.

First, I place significant weight in this case on the recommendation of the referee we appointed to make findings of fact and recommendations for disposition. The referee, who listened to Andrade and the other witnesses testify and who is in the unique position to evaluate their credibility, concluded that, in light of "significant mitigating factors," a suspension would "still serve to protect the public and deter lawyers who may otherwise be tempted to engage in illegal acts." Because so much of our judgment in this case must rest on an evaluation of respondent's character, I would heed the conclusion of the referee.

Second, a lengthy suspension—from 24 to 36 months—would express our strong disapproval of Andrade's conduct.[2] Considering the financial consequences of such a suspension to Andrade and his family, as well as the personal and professional stigma associated with attorney discipline, no one could reasonably conclude that a suspension of 24 to 36 months constitutes leniency on our part.

---

**2.** At bottom, Justice Anderson and I disagree only on the length of Andrade's suspension. To Justice Anderson, Andrade's impugnment of an unnamed (and apparently nonexistent) high-ranking person in the Minneapolis Police Department is particularly reprehensible— reprehensible enough to merit a suspension of at least 48 months, as opposed to my proposed 24 to 36 months. If "[t]he quality of mercy is not [to be] strain'd," William Shakespeare, *The Merchant of Venice* act 4, sc. 1, and if Andrade is ever to rebuild his practice, I think something less than 48 months is required. *Cf. State v. Streiff*, 673 N.W.2d 831, 841–42 (Minn.2004) (Anderson, Paul H., J., concurring).

Third, under Rule 18, Rules on Lawyers Professional Responsibility, a suspension of such length would require that Andrade petition for reinstatement and present evidence of his fitness to resume practice to a fact-finding panel. Only if Andrade presents clear and convincing evidence that he has undergone a moral change and gained sufficient insight into his misconduct so that the misconduct is not likely to recur would Andrade be reinstated to practice. *See In re Swanson*, 343 N.W.2d 662, 664 (Minn.1984). Thus, the hearing process under Rule 18 affords further protection to the courts, the legal profession, and the public that Andrade will be permitted to resume the active practice of law only after demonstrating his "present ability to adhere to the strict code of professional morality." *In re Peterson*, 274 N.W.2d 922, 926 (Minn.1979).

Finally, in my view, reinstatement subject to supervised probation provides further assurance to the public. The court rejects supervised probation with the observation that such probation is "unlikely to detect" the type of misconduct of which Andrade has been convicted. Yet the court allowed Andrade to practice under such supervision while these proceedings were pending. I believe that, upon reinstatement, the court can craft a probation that is reasonably likely to both deter such misconduct in the future and to detect it should it occur. For example, Andrade could be required to provide notice of his supervision to clients and to provide them with the name and contact information of his supervisor. Such information would give clients a ready means of notifying a person of authority of any improper solicitations by Andrade in the future.

For these reasons, I respectfully dissent.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Page.

ANDERSON, PAUL H., Justice (dissenting).

Who steals my purse steals trash; 'tis something, nothing;

'Twas mine, 'tis his, and has been slave to thousands:

But he that filches from me my good name

Robs me of that which not enriches him,

And makes me poor indeed.

William Shakespeare, *Othello* act 3, sc. 3.

I respectfully dissent. I join Justice Page's dissent, but write separately because I believe the sanctions recommended by Justice Page are insufficient. Andrade not only attempted to swindle his client, but in the process he impugned the integrity of the Minneapolis Police Department in general and more specifically that of the person in charge of the department's Drug Task Force. This latter act warrants more severe sanctions. Therefore, I would suspend Andrade from the practice of law for a period of not less than 48 months and, upon reinstatement, require that he be subject to supervised probation.

The undisputed facts in this case are that Andrade asked his client for money to be used to pay a bribe to an unnamed, high-ranking Minneapolis police official. The bribe was for the official's assistance in getting the pending drug charges against the client dismissed. The client reported Andrade's demand to the police; and, in a series of meetings recorded by the police, Andrade indicated to his client that Andrade had either paid $25,000 to the police official and needed another $25,000, or that he had already paid $15,000 and needed an additional $10,000 to pay the balance. The client then gave Andrade $5,000 in cash as a partial pay-

ment for the bribe. The money the client paid to Andrade was provided by law enforcement as part of a sting operation.

When soliciting money from his client on the premise of paying a bribe, Andrade violated Rule 8.4(e) of the Minnesota Rules of Professional Conduct.[1] Here, it is important to focus on exactly what Andrade did. For his own personal economic gain, he impugned the integrity of the Minneapolis Police Department and in particular a high-ranking person in that department. In his own words, he impugned the reputation of others because he saw "an opportunity to get paid." His identification of the individual to be bribed as the "person who is in charge of all the police of the Drug Task Force" was sufficiently specific that very few persons could have fit this description. Undoubtedly, when the report of Andrade's demand was first received by the police, a question was raised within the police department whether a certain member of the department had done something improper or illegal. We do not know if Andrade's misconduct led to any type of internal police investigation or distress to any particular officer. What we do know is that Andrade, just like a thief entering a home in the middle of the night to steal personal property, stole, or at a minimum attempted to steal, from some person a very valuable possession—that person's reputation. Such conduct is not only unprofessional, it is particularly reprehensible.

Finally, there is one other matter on which I disagree with the dissent. Justice Page concludes that no one person was individually harmed by Andrade's misconduct. I conclude that individuals were harmed by his conduct. In addition to

some unnamed, high-ranking police officer, Andrade harmed his client. He did so when his conduct confirmed his client's cynical view of the American justice system and violated their attorney/client trust relationship.

---

1. Rule 8.4(e) was amended effective October 1, 2005. The conduct at issue in this case took place before the effective date of the amendment. The amendment does not have any substantive effect on the issues or analysis in this case. Therefore, for simplicity, I cite to the current version of the rule.